IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 15, 2003 Session

## PATRICIA A. LYMAN v. LAWRENCE A. JAMES

**Appeal from the Circuit Court for Hamilton County**
**No. 01 C 918     W. Neil Thomas, III, Judge**

 **Filed December 30, 2003** 

**No. E2002-02859-COA-R3-CV**

---

After over thirty years of marriage, Patricia A. Lyman ("Wife") left Lawrence A. James ("Husband") and moved to the state of Washington and began living with her new boyfriend. After Husband learned of Wife's affair, the parties agreed to a divorce based on irreconcilable differences and entered into a marital dissolution agreement ("MDA"). Both parties signed the MDA before a Notary Public, but neither party was administered an oath prior to his or her signing. The MDA provided that Husband would receive the entire amount of his pension. Over six months after the parties were granted a divorce, Wife filed a new lawsuit claiming she gave up any claim to Husband's pension because of Husband's fraud and/or misrepresentations. Wife also claimed the court which granted the divorce lacked personal jurisdiction to enter the final divorce decree because neither Husband nor Wife were administered oaths prior to signing the MDA, which Wife claimed resulted in the MDA not being properly notarized. The Trial Court concluded the failure of the Notary Publics to administer oaths did not render the MDA invalid. The Trial Court also concluded Wife failed to meet her burden of proving fraud and/or misrepresentations on the part of Husband. Wife appeals, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the**
**Circuit Court Affirmed; Case Remanded.**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, J., and WILLIAM H. INMAN, SR. J., joined.

Phillip C. Lawrence, Chattanooga, Tennessee, for the Appellant Patricia A. Lyman.

Richard A. Schulman and R. Jonathan Guthrie, Chattanooga, Tennessee, for the Appellee Lawrence A. James.

# OPINION

## Background

Wife and Husband were married in March of 1970.  Husband filed a complaint in August of 2000 seeking a divorce from Wife on the basis of irreconcilable differences. Approximately two months later, the Trial Court entered a Final Decree granting the parties a divorce on the basis of irreconcilable differences.  Along with the Final Decree, the Trial Court approved and adopted the MDA submitted and signed by the parties.  Husband and Wife had two children who were no longer minors at the time of the divorce.  The primary purpose of the MDA was to divide the marital property and the marital debt.  According to the terms of the MDA, Husband retained all of his retirement benefits from his employer, Olin Corporation, as well as any IRAs held solely in his name.  Wife retained any IRAs held solely in her name.  When the MDA was approved, Wife was living in the state of Washington.  Paragraph fourteen of the MDA provided that:

> The Wife, Patricia A. James, has executed this Marital Dissolution Agreement in lieu of service of process, being fully aware that a Complaint for Divorce will be filed in the State of Tennessee, and defendant states that she waives further service in this proceeding and waives the filing of an Answer to the Complaint, said waiver of service being valid for a period of one hundred twenty days from the date the last party signs this agreement.  Defendant further acknowledges that her execution of this Marital Dissolution Agreement constitutes a general appearance and Answer before this Court giving said Court personal jurisdiction over the defendant, and further constitutes a default judgment for the purpose of the granting of a divorce on the grounds of irreconcilable differences in this case, pursuant to Tennessee Code Annotated, § 36-4-103(a)(2).

The MDA was signed and the signatures of both parties seemingly were notarized.

Over six months after the Final Decree was entered, Wife, who had since remarried, had second thoughts about not obtaining any of Husband's retirement benefits.  Wife then filed a new lawsuit seeking to have the Final Decree vacated or set aside for lack of jurisdiction arising from "the failure of the parties to have their signatures to the [MDA] properly acknowledged as required by Tennessee Code Annotated § 36-4-103." Wife also claimed the MDA should be set aside because of mistake, inadvertence, surprise or excusable neglect on her part, and/or because of fraud and misrepresentation by Husband.  Finally, Wife claimed the MDA should be set aside because of the "unconscionable inequity" in the division of the marital property.

In his answer, Husband denied the pertinent allegations set forth in the complaint. Husband claimed Wife failed to state a claim upon which relief could be granted and asserted,

among other things, that the filing of a new complaint was not the proper method in which to attempt to set aside the Final Decree, an argument which Husband does not pursue on appeal.

A two day trial took place in September of 2002. The first witness was Clarence Patton Hilliard ("Hilliard"), the owner and actuary of CPH Pension Administrators.[1] According to Hilliard, the estimated present value of Husband's retirement benefits totaled $679,817, assuming Husband retired at age 55 with monthly benefits of $4,648.82. Hilliard also testified that if Husband were to retire at age 65 with monthly benefits of $5,988.27, the present value of those benefits would be $375,185.

At trial, Wife testified to the various jobs she has had and the different places she and Husband lived over the years. According to Wife, they always deferred to Husband's career needs when deciding to move. Wife stated Husband handled all of the major financial matters and all major decisions within the family. In 1997, Husband's job with Olin Corporation was restructured and he moved his office into the marital home. At that time, Wife was working in the real estate business. In 1999, Husband and Wife formed a real estate partnership "for the sole purpose of selling real estate and mitigating taxes." Wife claimed she did not want to go into business with Husband and resisted the idea, but Husband prevailed. According to Wife, the only area where she was considered to have authority was in the real estate business. Wife testified when Husband moved his office into the home, he had more free time and began to focus on telling Wife how to run her real estate business and what she should and should not do.

In March of 2000, Husband and Wife celebrated their 30th wedding anniversary. Around the same time, Wife attended a real estate convention in San Francisco. Wife "met" a man at the convention and began a relationship with him. This is the person to whom Wife is now married. Wife visited her new paramour in various places while still married to Husband. Although Wife did not tell Husband about her affair, she did express concerns to Husband about their marriage. In particular, Wife told Husband she did not like or love him anymore and she "did not feel whole. There was a big, huge piece of me missing." Wife ultimately left Husband in July of 2000. Wife moved from Tennessee to the state of Washington after securing a real estate position in the town of Colville.

Wife testified that she and Husband had several conversations after they separated about dividing up the marital property. At trial Wife was shown a list of the marital assets and acknowledged she was aware of the existence of all these assets, including Husband's pension. However, Wife stated she was not aware of the monetary value of that pension. Wife testified that prior to her moving to Washington, she and Husband verbally agreed to split the assets on a 50/50 basis. Notwithstanding the foregoing, Wife acknowledged agreeing to forego any claim to Husband's pension in exchange for Husband's paying her health insurance premiums for the rest of her life. Wife had purchased a 1998 Ford Explorer and Husband also agreed to make all of the

---

[1] Since Hilliard's qualifications were not challenged at trial, we will not discuss his educational or professional background.

payments on this vehicle, which he did. The parties eventually agreed the value of the household furnishings was $30,000. Husband offered Wife $12,500 in cash for her share of the household furnishings, and Wife accepted this offer.

Wife moved to Washington where she began living with her new boyfriend. Soon thereafter, Wife received a telephone call from Husband at which time Husband informed Wife that he had hired a private investigator and he knew about her affair. Wife claims that Husband told her during this conversation that he had divorce papers drawn up and not to fight what she would be receiving because she was not entitled to half of the assets since she left Husband and was having an affair. According to Wife, Husband stated he was told by his lawyer that the assets Wife would be receiving in the proposed settlement were more than she would receive if the case actually went to court. Wife testified she believed Husband was telling her the truth. Wife also claimed Husband told her it would be a waste of time and money for her to retain a lawyer. Wife never did contact an attorney. Soon after this alleged conversation, Wife received the divorce papers from Husband, signed the MDA before a Notary Public, and returned the documents to Husband via overnight delivery. Wife eventually questioned the wisdom of signing the MDA and foregoing any rights to Husband's pension, resulting in the present lawsuit.

On cross-examination, Wife admitted it was her signature on the MDA. Wife's signature on the MDA was notarized by Joanne Olson ("Olson"), an employee at a local bank in Washington whom Wife knew. Wife testified no oath was administered when her signature on the MDA was notarized. Wife does not deny, however, that she signed the MDA before a notary public. Wife acknowledged leaving Husband for a man she had "only known for a few days." Wife discussed her various jobs with law firms as a secretary and/or paralegal. Wife filed a lawsuit for assault and battery against a coworker several years ago which she settled for $60,000. According to Wife, the conversation where Husband told her she would not do any better if the divorce went to court occurred on only one occasion. Wife admitted it was her decision to sign the MDA and no one "forced" her to sign that document. Wife's boyfriend even suggested she contact an attorney. Wife acknowledged having no physical or mental impairment at the time she signed the MDA. Wife does not claim Husband hid any assets from her. Since moving to Washington, Wife's financial condition has "diminished" and her real estate business with her current husband is not doing very well. The year before leaving Tennessee, Wife's gross income from selling real estate was $127,000.

The deposition of Darlene Brown ("Brown") was admitted into evidence. Brown is the general manager of Realty Center, GMAC's East Brainerd office in Chattanooga. Both Husband and Wife worked with Brown, although at different times. Brown occasionally socialized with Husband and Wife. Brown testified Wife told her that she had met someone and was going to go to Washington for an indefinite period of time to "see if that was something she wanted to pursue." Brown communicated with Wife via email after Wife moved to Washington. In an email dated July 28, 2000, Wife wrote to Brown:

> Hi. Larry knows, he hired a PI. Papers being filed as we speak. I am
> still very happy with my decision. It has cost me though. The laws

evidently hurt me since I have been a cheating wife. It is not 50/50, at least that is what he is threatening me with so I get nothing of his pension nor his 401. I hope Mike loves me poor.…

In another email to Brown, Wife stated that it "will all be over in 60 days from my signing the papers which I am told are on their way. Based on what I could glean, if I had been up front I would have gotten screwed too. Oh well, nothing like motivation to make a girl work.…" Brown testified she told Wife if she was concerned about the property settlement, she should meet with an attorney. Brown suggested on several occasions that Wife meet with an attorney and even gave Wife the names of several divorce lawyers she could contact.

At trial, Husband testified he was employed by Olin Corporation for thirty-three years and was the director of corporate accounts when he retired on December 31, 2001. Husband's annual base salary when he retired, excluding bonuses and the like, was approximately $190,000. Although retired, Husband does engage in some consulting and real estate work from time to time.

Husband testified he suspected Wife was having an affair and hired a private investigator. When his suspicions were confirmed, he confronted Wife and she admitted to the affair. Thereafter, Husband and Wife discussed dividing the marital assets in the manner as set forth in the MDA. Wife did not ask for any of Husband's retirement benefits. Husband claims Wife stated she did not want "any part of it." Husband stated he did not know what would have happened if the divorce case had been tried in court. Husband denied telling Wife that his lawyer said anything about what would happen. According to Husband, he told Wife there were two types of divorces in Tennessee, contested and uncontested. Husband claims Wife said she would prefer an uncontested divorce because she wanted to get on with her life.

Husband testified to how he and Wife divided their assets. The parties valued their household items at $30,000 and Husband offered Wife $12,500 in cash for her share of the household items, a sum which she agreed to accept. The parties equally divided a joint stock account and each of them received $66,276. Wife received the funds contained in her SEP and IRA accounts which totaled $96,200. Husband assumed the liability for the remaining mortgage payment on the marital home as well as the payments for Wife's car. According to Husband, the parties agreed on the amount of equity in the marital residence and Husband paid Wife her share, totaling $52,500. Husband testified he has complied with all of his obligations under the MDA. Husband is still paying for Wife's health insurance at the rate of $486 per month. Husband denied ever defrauding Wife into signing the MDA or concerning its terms.

Husband testified the net value of his 401(k) plan is $750,040. Husband currently receives $4,648.82 per month in retirement benefits. Husband also has another account which contains funds which were withdrawn from his primary pension account. The balance of this account is approximately $116,476. Husband stated that during the marriage, he and Wife went to financial planners to discuss their assets and they both received documentation each year setting forth

the balance in the various accounts. Husband signed the MDA before a Notary Public, although the Notary did not administer an oath.

Husband testified to an email he received from Wife dated August 7, 2000. This email states, *inter alia*:

> You need to know that my questions come because I did not consult an attorney. I never felt the need to do so because I wasn't going to go after anything that wasn't mine or that I wasn't entitled to. I agreed not to go after your pension and I meant it. … I'll be signing the papers today and FedEx them back.

Wife signed the MDA the same day the foregoing email was sent to Husband.

The parties' son also was called as a witness. According to the son, when his mother told him that she was moving to Washington:

> She said that she didn't want to live a material life, that she didn't want her jewelry, she didn't want the cars … she wanted to go and live in nature. She said that she wanted a change, that she was tired of being caught up in a material life ….

After the proof was completed, the Trial Court took the case under advisement and issued a Memorandum Opinion ("Opinion") several weeks later. In the Opinion, the Trial Court noted that for both Husband and Wife's signatures on the MDA, the signature and seal of the Notary Publics were affixed under the following statement: "Sworn to and subscribed to before me this 1st (7th) day of August, 2000." According to the Trial Court, Tenn. Code Ann. § 36-4-103(a)(2) requires an MDA to be "notarized," but that term is ambiguous. The Trial Court then concluded that the failure of the Notary Publics to administer an oath or swear the witnesses was not fatal to the validity of the MDA. As to Wife's allegations of fraud and the like, the Trial Court concluded the parties were in divorce proceedings, which it characterized as an "environment of distrust and anger." Because of this, there was no fiduciary relationship between Husband and Wife. The Trial Court went on to note that Wife stated she did not want any share of Husband's retirement. "Subtracting that amount results in assets allocated to [Husband] … of $197,296, compared with $253,776 to … [Wife]." The Trial Court then held that Wife failed to meet her burden of proof as to whether Husband acted fraudulently or misrepresented to her that she would not receive any of Husband's pension if the case went to court. The Trial Court also made specific note of the fact that Wife was told by several people on numerous occasions to seek legal advice, "and she chose not to." Based on the foregoing conclusions, the Trial Court entered judgment for Husband.

Wife appeals raising two issues, which we quote:

I.  Whether the procedure for obtaining a waiver of service of process pursuant to Tenn. Code Ann. § 36-4-103 was followed giving the Trial Court jurisdiction to enter a final judgment when a notary has administered no oath to either party upon the execution of the MDA.

II.  Whether the misrepresentations of … [Husband] which resulted in the gross inequity of the division of the marital estate constitute grounds for relief from the judgment.

### Discussion

The factual findings of a trial court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

The statute upon which Wife relies to challenge the validity of the MDA is Tenn. Code Ann. § 36-4-103, which provides, in relevant part, as follows:

> **36-4-103. Irreconcilable differences -- Procedure. –**  (a)(1) In all divorces sought because of irreconcilable differences between the parties, if the defendant is a nonresident, personal service may be effectuated by service upon the secretary of state pursuant to the provisions of § 20-2-215.
>
> (2)  In lieu of service of process, the defendant may enter into a written notarized marital dissolution agreement with plaintiff that makes specific reference to a pending divorce by a court and docket number, or states that the defendant is aware that one will be filed in this state and that the defendant waives further service and waives filing an answer to the complaint. Such waiver of service shall be valid for a period of one hundred eighty (180) days from the date the last party signs the agreement.… The signing of such an agreement shall be in lieu of service of process for the period such waiver is valid and shall constitute a general appearance before the court and answer which shall give the court personal jurisdiction over the defendant, and constitute a default judgment for the purpose of granting a divorce on the grounds of irreconcilable differences.…

Initially, we will discuss Wife's argument that the failure of the Notary Public to administer an oath to her when she signed the MDA resulted in ineffective service of process, thereby rendering the Trial Court without personal jurisdiction over her to enter a final judgment against her. We reject this argument, concluding that Wife is equitably estopped from challenging the validity of her signature. In *Werne v. Sanderson*, 954 S.W.2d 742 (Tenn. Ct. App. 1997), this Court discussed the elements of equitable estoppel as follows:

> The essential elements of an equitable estoppel as related to the party estopped are said to be (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; (3) Knowledge, actual or constructive of the real facts. As related to the party claiming the estoppel they are (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) Reliance upon the conduct of the party estopped; and (3) Action based thereon of such a character as to change his position prejudicially, 19 Am. Jur. Estoppel § . 42, pp. 642-643.

*Werne*, 954 S.W.2d at 745-46 (quoting *Consumer Credit Union v. Hite*, 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990)).

In the present case, it is undisputed that Wife signed the MDA before a Notary Public and the Notary Public affixed a seal to the MDA. There is nothing on the face of the MDA itself which even remotely indicates that it may not have been properly notarized.[2] At a very minimum the signature and notary seal gave the distinct impression that the MDA was properly signed and notarized. It goes without saying that Wife expected Husband to act upon a belief that the MDA had been properly executed by Wife. Both Husband and Wife certainly thought the MDA was effective as demonstrated by the fact that they both since have remarried.[3] Wife certainly was aware of the fact that no oath was administered prior to her signing the MDA. In short, we believe all of the elements of equitable estoppel are met in this case and Wife is estopped to challenge the validity of the MDA simply because no oath was administered to her when she admittedly signed the document in the presence of the Notary Public.

---

[2] We need not and do not express any opinion on whether the failure of a Notary Public to administer an oath, in and of itself, results in the MDA not being "notarized" as required by Tenn. Code Ann. § 36-4-103.

[3] This lawsuit involves Wife's attempt to obtain a portion of Husband's pension benefits. In order to obtain additional money, Wife expressly argues that the Trial Court altogether lacked personal jurisdiction over her. This argument attacks the validity of the entire divorce, not just one aspect of the marital property division. Given the fact that both parties are remarried, we are quite reluctant to conclude that the parties never were divorced and must assume that Wife simply fails to realize the potential ramifications of her argument.

Next, we will discuss Wife's argument that the failure of the Notary Public to administer an oath to Husband when he signed the MDA resulted in the Trial Court having no personal jurisdiction over Husband. Tenn. Code Ann. § 36-4-103 provides the procedural mechanism for service of process on a nonresident defendant when a divorce is sought based on irreconcilable differences. The statute provides that a written notarized MDA may be entered into between the parties and the MDA must contain certain specific references. This procedure is "[i]n lieu of service of process" on the nonresident defendant and constitutes a general appearance and answer, thereby giving a trial court personal jurisdiction over that defendant. The statute does not provide that the signed and notarized signature of a plaintiff is necessary to give the court personal jurisdiction over that plaintiff. Such a requirement is unnecessary in the present case because the Trial Court had personal jurisdiction over Husband once he filed the lawsuit. Even assuming Wife has standing to challenge whether the Trial Court had personal jurisdiction over Husband, it is clear that it did the moment Husband filed the lawsuit since all other necessary requirements such as residency were met. Wife's argument that the Trial Court lacked personal jurisdiction over Husband is without merit.

Finally, we address the Trial Court's conclusion that Wife failed to meet her burden of proof on her claim of fraud and/or misrepresentation. Wife's claim in this regard is based solely on one conversation wherein she claims Husband told her that, according to Husband's lawyer, the property division in the proposed MDA was as good if not better than what she would receive if the case went to trial. Husband denied making these statements. We agree with the Trial Court that there was no fiduciary relationship between Husband and Wife at that point in time. After thirty years of marriage, Wife had left Husband, moved to Washington, and began living with her new boyfriend. Husband learned of the affair after hiring a private investigator. Clearly, at that time the parties were in the heat of battle and no fiduciary relationship fairly could be claimed to exist. The Trial Court obviously credited the testimony of Husband when making its ultimate conclusion, which involved purely a credibility determination. In making this determination, the Trial Court heard the testimony of the various witnesses, including Husband and Wife. "Unlike this Court, the trial court observed the manner and demeanor of the witnesses and was in the best position to evaluate their credibility." *Union Planters Nat'l Bank v. Island Mgmt. Auth., Inc.*, 43 S.W.3d 498, 502 (Tenn. Ct. App. 2000). The trial court's determinations regarding credibility are accorded considerable deference by this Court. *Id.*; *Davis v. Liberty Mutual Ins. Co.*, 38 S.W.3d 560, 563 (Tenn. 2001). "'[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.'" *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). There is no such clear and convincing evidence to the contrary in this record. The preponderance of the evidence does not weight against the Trial Court's findings and resulting conclusion that Wife failed to meet her burden of proving fraud and/or misrepresentations by Husband. The Trial Court's conclusion in this regard is, therefore, affirmed.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for such further proceedings as may be required, if any, consistent with this Opinion, and for collection of the costs below.  The costs on appeal are assessed against the Appellant, Patricia A. Lyman, and her surety.

_____
D. MICHAEL SWINEY, JUDGE